CCC:JAM
F.#2017R01650

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                Docket No. <u>17-CR-522 (S-1)(SJF)</u>

JOHN AMBROSIO,
    also known as "Johnny Boy,"
THOMAS ANZALONE,
ALESSANDRO DAMELIO,
    also known as "Sandro,"
JOSEPH DURSO,
ANTHONY RODOLICO,
ANTHONY SALADINO and
FRANK SALERNO,
    also known as "Frankie Boy,"

                Defendants.

– – – – – – – – – – – – – – – – –X

MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Artie McConnell
Assistant U.S. Attorney
        (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of the pretrial detention of the defendants in the above-captioned matter.  This morning, a thirteen-count superseding indictment (the "Indictment") was unsealed charging defendants John Ambrosio, Thomas Anzalone, Alessandro Damelio, Joseph Durso, Anthony Rodolico, Anthony Saladino and Frank Salerno with racketeering conspiracy and substantive offenses including gambling, narcotics, loan sharking and obstruction of justice offenses.  Particularly significant in the context of bail, the Indictment charges defendants Ambrosio, Anzalone, Rodolico and Saladino with predicate acts and substantive charges relating to the extension and collection of extortionate credit, which constitute crimes of violence under 18 U.S.C. § 3156(a).  The Indictment also charges defendants Ambrosio and Rodolico with obstruction of justice conspiracy and attempt.

The charges relate to the defendants' participation in the affairs of the Gambino organized crime family of La Cosa Nostra (the "Gambino family" and "LCN," respectively), a violent criminal enterprise that engages in a litany of crimes, including, among others, murder, robbery, extortion, arson and obstruction of justice.  As stated in the Indictment, the defendants are members and associates of the Gambino crime family, with defendant Ambrosio holding the rank of acting captain.  Defendant Salerno is a member of the Bonanno organized crime family (the "Bonanno family") who, as alleged in the Indictment, associated and participated in criminal schemes with the defendants and other members and associates of the Gambino family.   As set forth below, the evidence against the defendants is overwhelming and includes, inter alia, numerous consensual recordings, wiretap recordings, witness testimony, including the testimony of multiple cooperating witnesses and victims, electronic evidence, documentary evidence and visual surveillance.

The government respectfully submits this memorandum in support of its request for a permanent order of detention with respect to defendants Ambrosio, Anzalone and Rodolico, and to continue the permanent orders of detention already in place with respect to defendants Saladino and Salerno.  The government also submits that defendants Damelio and Durso should only be released after presenting a substantial bail package.  For the reasons set forth below, each defendant represents a danger to the community and a risk of flight.[1]

## THE INDICTMENT

A grand jury in the Eastern District of New York has returned the Indictment under seal charging all defendants with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and related substantive offenses.  Listed in the chart below is a summary of the charged counts:

---

[1]  The government makes this motion without prejudice to making additional arguments in support of the detention of any of the defendants whose detention the government seeks in this motion or as to two defendants as to whom the government submits should only be released with a substantial bail package.

| Count # | Description & Date | Defendant(s) |
|---|---|---|
| 1 | Racketeering Conspiracy<br>January 1, 2014 – present | Ambrosio<br>Anzalone<br>Damelio<br>Durso<br>Rodolico<br>Saladino<br>Salerno |
| 2 | Collection of Unlawful Debt Conspiracy<br>January 1, 2014 – present | Ambrosio<br>Anzalone<br>Saladino |
| 3 | Extortionate Extension of Credit Conspiracy<br>January 1, 2015 – present | Ambrosio<br>Anzalone<br>Rodolico<br>Saladino |
| 4 | Extortionate Collection of Credit Conspiracy<br>January 1, 2015 – present | Ambrosio<br>Anzalone<br>Rodolico<br>Saladino |
| 5 | Extortionate Extension of Credit – John Doe #1<br>January 1, 2015 – present | Ambrosio<br>Anzalone<br>Rodolico<br>Saladino |
| 6 | Extortionate Collection of Credit – John Doe #1<br>January 1, 2015 – present | Ambrosio<br>Anzalone<br>Rodolico<br>Saladino |
| 7 | Illegal Gambling<br>January 1, 2014 – present | Ambrosio<br>Damelio<br>Durso<br>Saladino<br>Salerno |
| 8 | Conspiracy to Distribute Cocaine<br>June 2015 – December 2016 | Anzalone<br>Saladino<br>Salerno |
| 9 | Distribution of Cocaine<br>January 2016 – July 2016 | Saladino<br>Salerno |
| 10 | Conspiracy to Distribute Marijuana<br>June 2015 – September 2016 | Durso<br>Saladino<br>Salerno |

| 11 | Conspiracy to Distribute Alprazolam<br>July 2016 – August 2016 | Damelio<br>Durso<br>Saladino |
| 12 | Obstruction of Justice Conspiracy<br>September 2017 – present | Ambrosio<br>Rodolico |
| 13 | Obstruction of Justice Attempt<br>September 2017 – present | Ambrosio<br>Rodolico |

Listed in the chart below is a summary of the predicate racketeering acts alleged as part of Count One:

| R.A. # | Description & Date | Defendant(s) |
| --- | --- | --- |
| 1 | Extortionate Extension and Collection of Credit Conspiracy<br>January 1, 2015 – present | Ambrosio<br>Anzalone<br>Rodolico<br>Saladino |
| 2 | Extortionate Extension and Collection of Credit – John Doe #1<br>January 1, 2015 – present | Ambrosio<br>Rodolico<br>Saladino |
| 3 | Illegal Gambling<br>January 1, 2014 – present | Ambrosio<br>Damelio<br>Durso<br>Saladino<br>Salerno |
| 4 | Conspiracy to Distribute Cocaine<br>June 2015 – December 2016 | Anzalone<br>Saladino<br>Salerno |
| 5 | Distribution of Cocaine<br>January 2016 – July 2016 | Saladino<br>Salerno |
| 6 | Conspiracy to Distribute Marijuana<br>June 2015 – September 2016 | Durso<br>Saladino<br>Salerno |
| 7 | Conspiracy to Distribute Alprazolam<br>July 2016 – August 2016 | Damelio<br>Durso<br>Saladino |
| 8 | Obstruction of Justice Conspiracy and Attempt<br>September 2017 – present | Ambrosio<br>Rodolico |

## OVERVIEW OF THE INVESTIGATION

The Indictment returned in this case is the result of a long-term investigation by the Federal Bureau of Investigation (the "FBI"), Homeland Security Investigations ("HSI"), the Suffolk County Police Department, and the New York City Police Department ("NYPD") into of members and associates of the Gambino family operating in the Eastern District of New York.  The investigation is the latest in a series of investigations of La Cosa Nostra prosecuted by this Office.  In those investigations, members and associates of La Cosa Nostra have agreed to cooperate with the government, including high-ranking members of the Gambino family and the Bonanno family.  These cooperating witnesses have provided overwhelming evidence that the Gambino family continues to operate as a violent criminal enterprise, engaging in egregious criminal acts in Long Island and throughout the Eastern District of New York.  Court-authorized eavesdropping has also provided irrefutable evidence of the defendants' association and criminal activities.[2]  Additionally, an undercover member of law enforcement successfully purchased cocaine from defendants Saladino and Salerno on twelve separate occasions.  These controlled buy operations were recorded using both audio and video surveillance techniques.

The government proffers the following facts to summarize the allegations in Indictment, as evidence of the seriousness of the crimes charged, and to demonstrate the threat posed to the community by the defendants.[3]  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

I.      Loan Sharking Offenses

The Indictment charges defendant Ambrosio with directing a loan sharking operation involving defendants Anzalone, Rodolico, Saladino and others.  Testimony from cooperating witnesses and victims, as well as hundreds of intercepted communications between the defendants pursuant to court-authorized eavesdropping, confirmed and corroborated numerous extortionate loans and the often violent attempts by the defendants to collect payments.  Many of these extortionate loans are gambling-related.

---

[2] The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case.  In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the wiretap interceptions prior to their arrest was not feasible.

[3] Where the content of documents or conversations are described herein, they are done so in pertinent part and in substance.  For those calls and text messages described, not all relevant portions of such conversations have been described.  Where specific recorded conversations and text messages are described, they are set forth in draft form and in part and substance.  Text messages are transcribed as originally written.  To the extent that quotations are used in the descriptions, the quoted segments are based on draft, not final, transcripts and are subject to revision.

As an example, in an intercepted conversation between Saladino and Anzalone, the two discussed various "gambling debts" owed by other parties, during which Saladino told Anzalone that he will give the debtor "something to be scared about," but that he didn't want "beef," or conflicts, at his "club," because he is "responsible to John [Ambrosio] for what happens there."  In the same call, Saladino offered to "fix" another gambling debtor, saying "by the time we're done fucking [him], he's not going to have an office to play anywhere."  Saladino then told Anzalone that he will "show [him] who we are" and "shut them out" of all "the little spots that he goes to."  Anzalone then stated that he would "open his [the gambling debtor's] ass up."  In another intercepted conversation between Saladino and Anzalone, Saladino complained that it was his "week to go and make the rounds for the fucking, seven fucking miserable stops we got."  Anzalone later described a conflict he had with another individual, after which Saladino asked, "[o]h, you didn't tell him you was uh, who you were?"  Anzalone stated that he would "tell him who [his] friends are" – a reference to his organized crime affiliation – the next time he encounters the individual.

Many of the intercepted communications reveal the defendants' use of threats, intimidation and violence to collect money.  Indeed, in a conversation between Saladino and Ambrosio, Saladino informed Ambrosio about the above-described conversation with Anzalone.  Ambrosio instructed Saladino that he wanted to see this "little mother fucker [the debtor] tomorrow."  In speaking of another individual, Saladino informed Ambrosio that he would "straighten him out, believe me, you know John? I haven't had  fucking fight since my hip went out on me, but I'm gonna put him in his place."  In another intercepted call, Saladino recounted a collection effort where he threatened an individual that "[w]hen I get my hands around your fucking neck, everything is going to pop out of your ears, fuck you and your son."  In a text message exchange, Saladino sent an outgoing text to Ambrosio stating, "[j]ust so you know, I told Tommy [Anzalone]  we didn't get any money from either of those 2 guys Pete or Mike. I told him mark has to go in and confront Pete. Far to many different stories. So don't let him play you. We didn't get nothing."  Ambrosio responded "To late for Mike."  In another conversation, an individual asked for Ambrosio's help collecting a debt and recounted telling the debtor, "[i]f you don't give me my fucking money…I don't know if you know who I am and where I come from, but I promise you, you will never walk again. So get me my shit, or else I swear to God you're done."

During court-authorized electronic surveillance, law enforcement intercepted numerous communications involving defendants Ambrosio, Rodolico, and Saladino regarding their collection efforts from John Doe #1 (JD-1).  Several contained intimidating language and overt threats.  The following exchange occurred in one intercepted conversation:

SALADINO:  Listen, all your fucking excuses, I'm sick of
                       hearing them. That's not how you do business
JD-1:           I know that, I know. I never did that. I'm learning
                       hard.

> SALADINO: You're learning hard... You teaching me, you jerkoff! I'm telling you, I'm ready to make this fucking commitment today to pay the vig just to teach your fucking ass a lesson. Don't do this to me, you cocksucker…you make sure you get your ass there at eleven o'clock today and see my friend.

In one call involving JD-1 and Ambrosio, JD-1 indicated that he may not have the expected funds until the following day.  Ambrosio responded by saying:

> I don't wanna hear that shit…you been bullshitting from day one here…Listen...you bullshitting too much. I'm gonna tell you right now, you got it by six o'clock tonight, you call Tony [Saladino]. If you ain't got it by six o'clock tonight and tomorrow you don't have this money... I don't know what to fucking tell you, because I'm tired of this bullshit.

In another intercepted conversation, Ambrosio stated that JD-1 is "full of shit":

> AMBROSIO: You are supposed to have a check. Where is the check?
> JD-1: I am telling you everything the truth.
> AMBROSIO: You can't be telling the truth because the guy didn't pay you. What's the next thing you are going to say?

Ambrosio then handed the phone to Saladino, who told JD-1:

> Yeah, listen…listen let's forget everything... Just do me a favor, you fucked me and you fucked me real good. You fucked me with a smile and everything else. Now I'm going to tell you what…You don't have my money today I'm going to fuck you. Okay? Alright?... Hello! You know what…I been paying your fucking juice now, for three weeks. I been paying your fucking juice for three weeks…I'm at the point right now that I'm going to take this fucking debt and I'm gonna make it good and I don't give a fuck if I go back to prison... I will fucking make you feel the fucking pain.

Law enforcement also conducted surveillance of several "collections" from JD-1 involving Ambrosio, Rodolico, and Saladino, many of which were recorded using both audio and video surveillance techniques.  Indeed, Rodolico has been observed collecting payments from JD-1 on several occasions and as recently as late November 2017.

II.     Illegal Gambling Offenses

The investigation has revealed that defendants Ambrosio, Damelio, Durso, Salerno and Saladino are involved in variety of lucrative gambling operations, including the operation of gambling parlors, internet gambling and sports betting.

For example, law enforcement intercepted almost daily communications regarding one gambling parlor in Nassau County, where defendants Ambrosio and Saladino would frequently call subordinates to check the "bank" at the "club." In one typical call, Saladino instructed a subordinate to "look at the book," to which the response was "$5,883." Saladino then reminded the subordinate to "put the date next to each person that wins." Similarly, in one intercepted conversation between Ambrosio and a subordinate, Ambrosio asked "what's happening…anybody there?" and was informed that "Richie won hundred and eighty [180] Oscar two fifty [250], and one eighty [180]. He put everything in machine number four…Tony came early. When I got there he won four hundred fifty two [452]…There's money there. The money is there, more than that." In one intercepted call, Ambrosio told and individual "[y]ou know football is coming, so you better come to this fucking club."

In one intercepted conversation, Saladino and Damelio discussed a new gambling parlor venture:

> DAMELIO: I'm going to make an arrangement with him. We're going to meet next week for dinner. I want to show him the place and everything. He use to run his own games, but he use to bankroll it. I told him, "you don't bankroll it." I said, "my guys will bankroll it, you just bring the players." Right?
>
> SALADINO: Absolutely.
>
> DAMELIO: Alright, done.
>
> SALADINO: Absolutely. Set it up.
>
> DAMELIO: He said he use to run 30, 30 thousand  50 thousand games a night.
>
> SALADINO: Yeah, without a doubt. Let's put it together, buddy.
>
> DAMELIO: Done. I'm in his place right now.

In a subsequent conversation, Damelio asked if Saladino wanted to "take the cash for me?" Saladino replied, "I think John's gotta see you." Saladino then texted Ambrosio that "Sanrdo [Damelio] is on his way to your place."

Law enforcement has conducted surveillance and observed the defendants at these "clubs." Additionally, law enforcement recently executed a search warrant on a Nassau County storage facility in defendant Saladino's name and recovered several electronic gambling machines and card tables.

The investigation has also revealed the defendants' involvement in internet gambling and sports betting.  In one exchange captured pursuant to court-authorized electronic eavesdropping, Saladino received an incoming text from John Doe #2 (JD-2), stating "[h]ey call me when you can, mgm closed us."  Saladino responded "I am taking care of that now."  Shortly thereafter, Saladino also received a text message from Salerno, "call me they shut [JD-2] down."  Saladino and Salerno then engaged in a series of phone conversations where the two discussed JD-2 getting "shut down" because of an issue with the "codes."  Saladino later assured JD-2 that he "talked to Frankie [SALERNO]" who would "take care of it first thing tomorrow morning":

> SALADINO:  I don't know what happened, but he says he's
> gonna get you set up don't worry about it.
> JD-2:  Allright because we have a bunch, then we have
> like pending players too.
> SALADINO:  Whatever it is though, he says don't worry about
> it you're gonna get what you got coming and
> you're gonna be open.

In a subsequent related exchange, Saladino queried Salerno "what time can we see [JD-2]?" to which Salerno replied, "[n]ot till later I gotta go out far to collect."  Saladino later sent a text message to JD-2, "[j]ust giving you a heads up, Frankie will be out here late this afternoon with your new code, and your money."  Later, Ambrosio asked Saladino if he is "going to see [JD-2] today," and Saladino assured him that he had "just seen Frankie [Salerno], now everything is correct for tomorrow."

Additionally, during court-authorized eavesdropping, both Ambrosio and Salerno would receive frequent text messages from individuals placing sports bets.  For example, Ambrosio received text messages such as "Cincinnati + 160 Cincinnati plus one and a half runs," "Los angeles angels plus 1 and a half. Tampa Bay - 104 Miami over seven and a half," and "Tampa Bay + 119," and "Yankees + 130 Yankees plus one and a half."  Salerno received similar text messages, such as "Play Boston and yankees for 4thof July. Ill call you tuesday ok," and "Baltimore+120 San Francisco-217 And UNDER 7."  All of these communications are odds and bets placed on sporting events.  In one outgoing phone call, Ambrosio informed an individual that she did not have to travel to the Foxwoods Casino in Connecticut, and that the individual could play "right here" and "save gas money."

III.    Narcotics Trafficking Offenses

As charged in the indictment, defendants Anzalone, Damelio, Durso, Saladino and Salerno have been involved in the distribution of a variety of narcotics, including cocaine, marijuana, and Xanax.  Evidence in support of these charges has been obtained from sources such as cooperating witnesses, court-authorized eavesdropping and controlled purchases of cocaine by an undercover member of law enforcement ("the UC").  Additionally, during the course of the investigation, law enforcement observed Anzalone, Damelio, Durso, Saladino,

10

Salerno, and others consummate several narcotics transactions referenced during intercepted communications.

      A.    <u>Cocaine Distribution Conspiracy</u>

      As alleged in the indictment, Salerno sourced cocaine in kilogram quantities, which he and Saladino then supply to lower-level distributors, including Anzalone, for retail sale.  In or about and between February 2016 and June of 2016, the UC purchased cocaine from defendants Saladino and Salerno on twelve separate occasions.  Laboratory reports indicate that the aggregate weight of the cocaine purchased by the UC exceeds half a kilogram.

      The UC would communicate with defendant Saladino via cell phone, using both voice calls and text messages, in order to set up dates, times, and locations to meet.  These conversations and text messages were monitored and recorded by the UC or other members of law enforcement.  At their face-to-face meetings, the UC and Saladino would discuss and consummate narcotics transactions.  These meetings were monitored and recorded by members of law enforcement, who were conducting physical surveillance of the locations.  While Salerno was only present at a few of these purchases, wiretap intercepts between Saladino and Salerno revealed that Salerno sourced the cocaine and acted in concert with Saladino to complete the UC sales.[4]

      By way of example, during one transaction, Saladino provided the UC one ounce of cocaine in exchange for $1300 cash.  SALERNO gave the UC $50 cash as change.  When queried about the price, Salerno stated in substance that prices were high because he didn't "re-press the bricks," or dilute the quality of cocaine with a cutting agent, and that recent narcotics seizures by law enforcement were driving prices higher.  Later, the UC attempted to negotiate a better price with Salerno:

      UC:         But Frank eh if if I paid for like ah say a
                       hundred grams or let's say three…
      SALERNO:  Oh then I can work with you.

Similarly, in another transaction, Saladino informed the UC that "Frank [Salerno]" suggested that the UC "break a couple off the brick" – referring to a kilogram quantity of cocaine – and repay Saladino and Salerno after the cocaine is repackaged and resold.  In another meeting, the UC offered to pay in full for the cocaine and asked for a better price as a result.  Saladino and Salerno then engaged in the following text message exchange:

      SALADINO:  Bro if [the UC] pays us up front now can
                      you do better.

---

      [4] During their interaction with the UC, Saladino and Salerno also offered to supply the UC with marijuana.  Saladino also informed the UC that he could lend money for "points" and, at one point, asked the UC for help in procuring a firearm.

> SALERNO:   Best we can do is 2760…That's 40 each
> can't do better than that
> SALADINO: Okay done, plus i got what he owed us.

Notably, Saladino informed the UC that both he and Salerno were involved in organized crime, stating that Salerno "has got that thing" – or organized crime membership – and that Saladino "runs with some really nice guys" and has "three brothers" that are "straightened out." Saladino also asked the UC for assistance in procuring a firearm.

As with their sales to the UC, Saladino and Salerno supplied cocaine to other dealers, including Anzalone. Specifically, numerous intercepts between Saladino and Anzalone revealed that Anzalone would purchase cocaine for further retail distribution. For example, in one intercept, Anzalone inquired if Saladino can "get one of those things tomorrow." Saladino then called Salerno and told him that "Tommy [Anzalone] just called me, you know. He wants one." Salerno confirmed that the conversation referenced cocaine, asking, "you're talking about the same thing like [the UC], right?" In another intercepted conversation, Saladino and Anzalone disputed a quantity of cocaine previously purchased:

> SALADINO: Aight, you want to meet me, I'll go over there
> right now and I'll straighten that out.
> ANZALONE: Nah, nah. Just...
> SALADINO: I thought it... I was right there when he cut that.
> ANZALONE: Nah, I just, I just, I just put it on. It's 25 and a
> half.

Then, in an outgoing text later that day, Saladino informed Anzalone that "[h]e told me to stop at his house now and he will give me the 4 to give you." Saladino later texted Anzalone "I will be there. I will call you before i come your way. I ripped him a new asshole thats twice he got over in me. He has to have his beam set wrong."

B.    Marijuana Distribution Conspiracy

As charged in the indictment, wiretaps and other sources of evidence confirmed that defendants Durso, Saladino and Salerno were involved in the distribution of a large amount of marijuana. For example, in one intercepted conversation, Durso asked Saladino if Saladino is "still keeping in contact with Frankie," meaning Salerno:

> DURSO:       Are you still keeping in contact with Frankie?
> SALADINO: Absolutely.
> DURSO:       I wanted to call him, one of my good buddies
> who fucking moves a shit load of fucking shit.
> He had a hook down in Cali and someone is sour
> with his guy and he's not answering anymore. I
> wanted to work something out with Frankie.

Durso, Saladino and Salerno agreed to meet at one of the aforementioned "clubs" utilized by the defendants.  Subsequent intercepted conversations reference "harvest time" and greenhouses," confirming that Salerno is a wholesaler who has several "growers" and "never goes dry."

       C.    <u>Xanax Distribution Conspiracy</u>

       Based on witness information, electronic eavesdropping, and other evidence, Damelio sourced a large quantity of Alprazolam, commonly known as Xanax, which Saladino helped distribute through Durso and others.  For example, in one intercepted conversation, Saladino stated that he "was looking at 10,000 of them [pills]," and referred to Xanax as "Z" and "bars."  Subsequently, Saladino informed Damelio that he would " "call..as soon as [he] get[s] a hold of Joey [Durso]":

> SALADINO: He definitely called me last night, and he told
> he'll see me today for that. The only thing is he's
> not looking for all of that.
> DAMELIO:  Alright
> SALADINO: And he told me Tony you give me a week I'll
> take the rest of it.
> DAMELIO:  Okay.
> SALADINO: If you can handle it that way, fine. He's good at it
> you know.
> DAMELIO:  I could be good with that let's just see how many
> of the tiles he's gonna take, that's all thats fine.

That same day, after meeting Damelio at one of the aforementioned "clubs," Saladino called Durso and stated the price "gotta be 250."  Durso asked if he "do anything on the arm," and the two agreed that "250 on the arm" was acceptable, and that the transaction would be consummated at the "club" at a later time.  Subsequent intercepted communications amongst Damelio, Durso and Saladino reference the retail sale and repayment for the Xanax.

IV.    <u>Obstruction of Justice</u>

       Following the arrest of Saladino and Salerno on cocaine distribution and conspiracy charges, both Ambrosio and Rodolico have made efforts to obstruct justice and frustrate the investigation by, <u>inter</u> <u>alia</u>, intimidating and unduly influencing JD-1. Specifically, Ambrosio has instructed JD-1 to lie about the nature of the payments made to Ambrosio, Rodolico and Saladino, both to federal investigators and to the grand jury.

Similarly, during one recent "collection," Rodolico instructed JD-1 that he should "deny everything" if served with a grand jury subpoena.

APPLICABLE LAW

I.      Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

II.     Organized Crime Defendants

Courts in this circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family members detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005) (summary

14

order); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Lucchese organized crime family acting boss detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese family acting boss detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand for the following propositions: (1) leaders of a violent criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are often insufficient to protect the community from dangerous organized crime defendants.

A.     Leaders of a Violent Criminal Enterprise Are Dangerous Due to Their Position of Authority in That Enterprise

Pretrial detention is warranted where defendants, charged with violent crimes, are high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Defede, Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety:  "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence. Defede's continued liberty therefore presents a substantial danger to the public . . . ."  Defede, 7 F. Supp. 2d at 395.

Moreover, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the Indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11.  The Second Circuit affirmed those findings by summary order.  See Cirillo, 149 Fed. Appx. at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only

from their own violent activities but from those of subordinates whom they supervise." (citing Ciccone, 312 F.3d at 543)).

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization. Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98). As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. As the court held in Defede:

> [I]t is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct—just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

7 F. Supp. 2d at 392 n.4.

Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family, fall within a "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community." Colombo, 777 F.2d at 99 (quoting S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

Nor is the above case law narrowly limited to organized crime "bosses" or "acting bosses." In Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise. Likewise, in Colombo, 777 F.2d at 99-100, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations." (internal quotation marks omitted).

16

B.    Organized Crime Defendants Are Likely to Commit Crimes if Released
      on Bail

Organized crime defendants pose a particular threat to the community due to
the continuing nature of the charged enterprise and its violent criminal activities.  Because
organized crime defendants are often career criminals who belong to an illegal enterprise,
they pose a distinct threat to commit additional crimes if released on bail.  See Salerno, 631
F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant
attention and protection, and recognizing a strong incentive on the part of its leadership to
continue business as usual).

Congress noted that defendants pose a danger to the community not only when
they commit acts of violence, but also when it is likely that they will commit even non-violent
crimes that are detrimental to the community.  See S. Rep. No. 225 98th Cong., 1st Sess. at
6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195
("[L]anguage referring to safety of the community refers to the danger that the defendant
might engage in criminal activity to the detriment of the community . . . . The Committee
intends that the concern about safety be given a broader construction than merely danger of
harm involving physical violence.").  In Salerno, the court approvingly quoted the Second
Circuit's decision in Colombo, which had held:

> In light of Congress' direction that "[w]here there is a strong
> probability that a person will commit additional crimes if
> released, the need to protect the community becomes sufficiently
> compelling that detention is, on balance, appropriate," . . . we
> hold that the decision to release Colombo based upon conditions
> which we consider to be wholly inadequate was clearly
> erroneous.

631 F. Supp. at 1371 (quoting Colombo, 777 F.2d at 99 (quoting Senate Report at 3189)
(citation omitted)).

C.    Elaborate Bail Packages Are Insufficient to Protect the Community
      Against Violent Organized Crime Defendants

The Second Circuit repeatedly has rejected "elaborate" bail packages for
organized crime defendants.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail
package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir.
1993) (rejecting $3 million bail package secured with real property, home detention, restricted
visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100
(rejecting $500,000 bail package secured by real property).  In addition, the Second Circuit
has viewed home detention and electronic monitoring as insufficient to protect the community
against dangerous individuals.  In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotation marks omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted); United States v. Dono, 275 Fed. Appx. 35, 37 (2d Cir. 2008) (clear error for district court to release Colombo family defendants on bond with conditions including home confinement, electronic monitoring and requirement that they not associate with members of organized crime where, inter alia, district court's "directives to the defendants not to harass the victims [of a charged assault] or have contact with other Colombo family members do not ensure that they will comply" (citing Colombo, 777 F.2d at 99-100)).

Similarly, courts in this District have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-*4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

III.    Loan Sharking Offenses Are Crimes of Violence

A compelling factor favoring detention for Ambrosio, Anzalone, Rodolico and Saladino is the fact that they are charged with loan sharking offenses that are considered crimes of violence under 18 U.S.C. § 3156(a).

Specifically, Section 3156(a)(4) defines the term "crime of violence" to include, inter alia: "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."  Extortionate extension of credit, extortionate collection of credit and conspiracy to commit those offenses qualify as crimes of violence pursuant to the Bail Reform Act.  See 18 U.S.C. § 891(7) (defining "extortionate means" to be "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person,

reputation, or property of any person"); id. § 3156(a)(4)(A) (defining "crime of violence" as having as an element "the use, attempted use, or threatened use of physical force against the person or property of another"); United States v. Cicale, 2006 WL 2252516 (E.D.N.Y. Aug. 7, 2006) ("It is the law of this circuit, as conceded by the defense . . . , that the two loansharking counts against Cicale are crimes of violence, and are especially probative of dangerousness where, as here, the Defendant is alleged to have assaulted a victim to collect a debt." (citing United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir.1991) (finding that violence committed "over a small debt is probative of dangerousness")) (unpublished decision); United States v. DiGiacomo, 746 F. Supp. 1176, 1185 (D. Mass. 1990) (designating loansharking as "crime of violence" for Bail Reform Act purposes); see also United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as that term is defined by the BRA."); United States v. Santora, 225 Fed. Appx. 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e); Ciccone, 312 F.3d at 541)) (unpublished decision).

## ARGUMENT

When balancing the specific considerations of the Bail Reform Act, permanent orders of detention should be entered as to defendants Ambrosio, Anzalone, and Rodolico, and the permanent orders of detention already in place with respect to defendants Saladino and Salerno should be continued. The government also submits that Damelio and Durso should only be released after presenting substantial bail packages.

## I.   Defendant John Ambrosio

Ambrosio is a long-time Gambino soldier and a fixture of organized crime on Long Island. As described previously, he is currently serving as an acting captain in the Gambino family and operates lucrative gambling and loan sharking operations throughout Nassau and Suffolk counties. As such, Ambrosio poses a particular threat if he were released because of his ability and demonstrated history of directing those who report to him to commit crimes and acts of violence. Following the arrests of Saladino and Salerno in September 2017, Ambrosio has also demonstrated the intent and willingness to obstruct justice.

The defendant's history and personal characteristics also favor detention. The defendant's criminal history spans over three decades and includes at least three convictions for criminal contempt offenses, reflecting the defendant's utter disregard for the law and the justice system. Most recently, the defendant was convicted in 2003 for federal gambling and loan sharking offenses, and the instant investigation has revealed that Ambrosio's organized crime activities have continued unabated. Notably, the defendant has failed to file income tax returns for almost ten years, despite his sizable income from illicit activities.

The seriousness of the danger posed by the defendant's release should not be underestimated in light of his membership in, and leadership role within, the Gambino family, a violent criminal enterprise, and his involvement in crimes of violence. As noted above,

courts in this circuit have recognized that when organized crime defendants are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention. See Salerno, 631 F. Supp. at 1364. Put simply, not even home confinement can protect the community from Ambrosio and his confederates.

Faced with his criminal history and the overwhelming evidence in this case, and with deference to controlling legal precedent, Ambrosio cannot sustain his burden and demonstrate by clear and convincing evidence that he is not a danger to the community or a risk of flight.

II.     Defendants Thomas Anzalone and Anthony Rodolico

Defendants Anzalone and Rodolico are charged with various racketeering offenses, including loan sharking offenses that are considered crimes of violence under the Bail Reform Act. Indeed, the evidence in this case – including intercepted conversations involving Anzalone, Rodolico, and other defendants and coconspirators – plainly show their willingness to use intimidation and violence.

Notably, Anzalone has a 2012 felony conviction for Criminal Usury in the First Degree.[5] Undeterred and unrepentant after that conviction, his continued involvement in organized crime and violent loan sharking offenses highlight his dangerousness and mandate that he be detained.

While Rodolico has no known criminal history, his attempts to obstruct justice in this case demonstrate that he has no regard for the federal criminal process and is willing to tamper with witnesses and evidence, including the testimony of individuals whom he believed could testify against him. That risk is only heightened now that he has been charged in the Indictment and faces the possibility of many years in prison. This criminal conduct – by itself – is clear and convincing evidence of Rodolico's dangerousness and the need to detain him pending trial.

III.    Defendants Saladino and Salerno

In September of 2017, both Saladino and Salerno were arrested and charged by complaint with cocaine distribution offenses, and permanent orders of detention were entered after lengthy bail colloquies on the record. See United States v. Saladino, 17-CR-803 (SIL), ECF Docket Nos. 2 and 4; United States v. Salerno, 17-CR-809 (SIL), ECF Docket Nos. 3

---

[5] New York Penal Law Section 190.42 reads, "[a] person is guilty of criminal usury in the first degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period and either the actor had previously been convicted of the crime of criminal usury or of the attempt to commit such crime, or the actor's conduct was part of a scheme or business of making or collecting usurious loans.

and 5.  On October 4, 2017, attendant to their arraignment on the underlying indictment in this case, both defendants again made extensive bail applications before the Honorable Gary R. Brown, which were denied.  See 17-CR-522 (SJF), ECF Docket No. 11.  The permanent orders of detention currently in place for these defendants should be continued.

Saladino is a long-time Gambino associate who, in 1977, committed a double homicide and served over twenty-five years for Murder in the Second Degree.  Salerno is a Bonanno family soldier who pled guilty in 1997 to Attempted Conspiracy in the First Degree,[6] charges which stemmed from his participation in a homicide with a firearm in the Bronx. Salerno has also been implicated in delivering messages from incarcerated Bonanno boss Michael "the Nose" Mancuso to other high-ranking organized crime members.

As an initial matter, because both Saladino and Salerno have been indicted for narcotics-trafficking offenses that carry a mandatory minimum sentence of ten years' imprisonment, there is a presumption that there are no conditions of release that can reasonably assure their appearance and the safety of the community.  See 18 U.S.C. § 3142(e)(3).  Considering the evidence proffered above and their criminal histories, neither Saladino nor Salerno can rebut such a presumption, regardless of any bail package that may be proposed.

Most significantly, at the time of their respective arrests, both Saladino and Salerno were in possession of items indicative of their involvement in violence and organized crime.  Specifically, Saladino was in possession of two improvised weapons – a padlock attached to the end of a length of rope, and a sawed-off, makeshift wooden club with a duct taped handle.  Similarly, Salerno was in possession of several knives and bear mace, in addition to numerous cell phones, thousands of dollars in cash, and notebooks that appeared to document gambling, narcotics, and debt collections.

Thus, because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight, the permanent orders of detention for defendants Saladino and Salerno must remain in effect.

III.   Defendants Alessandro Damelio and Joseph Durso

While defendants Damelio and Durso are not charged with violent crimes, their illicit conduct on behalf of the Gambino family poses a danger to the community if they are released.  As the Second Circuit has made clear, the concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d

---

[6] New York Penal Law Section 105.17 reads, "[a] person is guilty of conspiracy in the first degree when, with intent that conduct constituting a class A felony be performed, he, being over eighteen years of age, agrees with one or more persons under sixteen years of age to engage in or cause the performance of such conduct."

Cir. 1993) (quoting legislative history).  Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking," which both defendants have engaged in.  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  Accordingly, Damelio and Durso should only be released upon presentation of a substantial bail package that includes electronic monitoring.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that, as to defendants Ambrosio, Anzalone, Rodolico, Saladino and Salerno, "no condition or combination of conditions will reasonably assure [the defendants'] appearance . . . as required and the safety of the community," and that they should be detained pending trial.  18 U.S.C. § 3142(e)(3)(B).  The government further submits that, in light of the foregoing, defendants Damelio and Durso may only be released upon presentation of a substantial bail package.

Dated:      Central Islip, New York
            December 12, 2017

                              Respectfully submitted,

                              BRIDGET M. ROHDE
                              Acting United States Attorney
                              Eastern District of New York


                        By:     /s/
                              Artie McConnell
                              Assistant United States Attorney
                              (631) 715-7825